**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | **CHAPTER 11** |
| | : | |
| **90 West Street LLC,** | : | **CASE NO. 18-40515 (NHL)** |
| | : | |
| Debtor. | : | |
| _____ | : | |

**MOTION OF 90 WEST STREET LLC FOR ORDERS (I) APPROVING BID
PROCEDURES AND PROVIDING CERTAIN PROTECTIONS TO STALKING
HORSE; AND (II) AUTHORIZING THE (A) SALE OF SUBSTANTIALLY ALL
OF THE ASSETS OF THE DEBTOR, FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES, AND (B) THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES**

90 West Street LLC ("Debtor" or "90 West Street"), by its attorneys, hereby moves (the

"Motion") this Court for entry of orders (i) approving bid procedures and providing certain

protections to a new duly organized entity to be formed, comprised of an investor group led by

the Brach family as the head of the new investor group, which may include Apex Rehabilitation

& Healthcare, Next Step Healthcare, and perhaps Larry Lipschutz, depending on the outcome of

final internal negotiations (the "Stalking Horse"); and (ii) authorizing the (a) sale of substantially

all of the Debtor's assets, free and clear of all liens, claims and encumbrances

("Encumbrances"), and (b) the assumption and assignment of certain executory contracts and

leases. In support of this Motion, the Debtor respectfully represents as follows:

### Preliminary Statement

The Motion seeks entry of two orders:

(a)     entry of an order (the "Bid Procedures Order," substantially
in the form attached hereto as Exhibit A) approving the
proposed bid procedures (the "Bid Procedures," a copy of
which are attached as Exhibit 1 to the Bid Procedures Order),

and providing a break-up fee which is not predicated upon a percentage of the purchase price, but instead is comprised of reimbursement of the Operating Contribution (as defined below), plus the right to outbid any competing offer by $1,000 (the "Break-Up Fee") to the Stalking Horse in connection with its offer to purchase the assets of the Debtor for $10 Million Dollars ($10,000,000) (the "Stalking Horse Bid"), potentially in combination with a coordinated sale of the assets of Grosvenor Prop/Co., which owns the land at 7 Loring Hills Avenue, Salem, Massachusetts (the "Grosvenor Property"), where the Grosvenor Park Health Center LLC ("Grosvenor Op/Co.) is located, for another $11 million. The mechanics for the sale of the Debtor's property are subject to further negotiations, but will likely be done simultaneously with the sale of the Grosvenor assets; and

(b)    entry of an order approving the sale (the "Sale Order"), authorizing the sale of substantially all of the Assets free and clear of liens for the proposed price obtained after implementation of the proposed Bid Procedures (as described herein, the "Sale"),

The Debtor and Oxford believe that that the selection of the Stalking Horse, and the proposed Bid Procedures, including but not limited to the Break-Up Fee, are necessary to move the properties out of bankruptcy as quickly as possible, and will be designed to maximize the return to the Debtor's creditors and other parties in interest. An auction and sale of substantially all of the Debtor's assets is the most efficient way to both protect the interests of the residents of the skilled nursing facility owned by the Debtor's affiliate and to maximize the value of the Debtor's assets and the Debtor respectfully requests entry of the proposed orders.

Contemporaneously herewith, the Debtor will be filing its Motion to Approve Retention of Broker to Market Assets ("Motion to Retain Broker"), which will be necessary to implement the Sale and Bid Procedures for which approval is requested herein.

To the extent possible, at this juncture, 90 West Street and the Grosvenor Property may be sold simultaneously in a single package with appropriate allocation as to each property based upon ongoing negotiations.  Indeed, the overall mechanics of the auction process are still under

discussion.  In the interim, the Debtor and Oxford are moving to gain Bankruptcy Court approval of theses bidding procedures so corresponding bidding procedures can be filed in connection with the Receivership proceeding involving Woodbriar.  The situation is fluid, and the parties will file supplements as events continue to unfold.

## Jurisdiction and Venue

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## The Chapter 11 Case

4.      On January 30, 2018 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtor owns the real property (the "Property") that is leased to Woodbriar Health Center, LLC ("Woodbriar") for use as a 142 bed skilled nursing facility pursuant to that certain Lease Agreement dated as of March 1, 2015 by and between 90 West Street and Woodbriar (the "Facility Lease").  The Debtor and Woodbriar are both borrowers pursuant to a Term Loan Agreement and a Revolving Credit Agreement with Oxford Finance LLC ("Oxford") as lender.

6.      On November 9, 2017, Oxford filed its *Verified Complaint and Request for Appointment of Receiver* and related *Emergency Motion to Appoint a Receiver* against Borrowers, commencing the case captioned *Oxford Finance LLC v. 90 West Street LLC, et al.*, in

the Superior Court of Massachusetts, Middlesex County ("State Court"), Case No. 1781CV03295 ("State Court Action").

7.    On November 22, 2017, the State Court entered the *Memorandum of Decision and Order on Plaintiff's Motion for Appointment of Receiver* ("Receivership Order"), appointing KCP Advisory Group, LLC, by and through Jacen Dinoff, as the receiver for the Property and other assets (the "Receiver"). The Receiver has been in possession and control of the Property since the Receiver's appointment pursuant to the Receivership Order in the State Court Action.

8.    On March 23, 2018, this Court entered the *Stipulation and Order to Provide Adequate Protection and to Permit Receiver to Continue in Possession and Excuse Compliance with 11 U.S.C. § 543* (Dkt. 17), permitting the Receiver to continue to oversee the finances of the Property and to continue to perform its duties, responsibilities, and obligations with respect to the Property in accordance with the Receivership Order, except that the Receiver cannot proceed to sell or market the Property without further order of the Bankruptcy Court.

9.    By this Motion, the Debtor seeks an order approving bidding procedures and a sale of the Property and an assumption of the Facility Lease as set forth herein.[1]

10.    No committee of unsecured creditors has been appointed in the Debtor's chapter 11 case.

### The Debtor's Prepetition Capital Structure

11.    Oxford was the principal lender to 90 West Street and Woodbriar (collectively, the "Borrowers"). On or about March 10, 2015, Oxford loaned the Borrowers the aggregate principal amount of $19,300,000, pursuant to that certain Term Loan and Security Agreement by

---

[1] Woodbriar and Oxford are also seeking an order in the State Court Action authorizing the Receiver to sell the assets of Woodbriar in the same auction as is proposed herein under a coordinated process based upon a corresponding stalking horse contract.

and between Oxford and the Borrowers dated as of March 10, 2015, and evidenced by: (i) a term loan promissory note, dated as of March 10, 2015, in the principal sum of $10,000,000 executed by the Borrowers in favor of Oxford; (ii) a term loan promissory note, dated as of March 10, 2015, in the principal sum of $5,000,000 executed by the Borrowers in favor of Oxford; and (iii) a term loan promissory note, dated as of March 10, 2015, in the principal sum of $4,300,000 executed by the Borrowers in favor of Oxford (collectively, the "Term Notes").

12.    The Term Loan Agreement is secured by a Security Agreement dated as of March 10, 2015 among Oxford and the Borrowers, granting Oxford a security interest in all of Borrowers' assets, including, without limitation, Borrowers' then existing and all future arising accounts receivable.  Also as security for the Term Loan Agreement, 90 West Street executed a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of March 10, 2015, granting Oxford a security interest in the Property.

13.    On or about March 10, 2015, Oxford and the Borrowers entered into that certain Credit and Security Agreement dated as of March 10, 2015, by which Oxford extended a line of credit to the Borrowers in the principal amount of $2,000,000, evidenced by a revolving loan promissory note of even date executed by the Borrowers in favor of Oxford in the same amount (the "Revolving Note" and with the Term Notes, the "Notes").

14.    As security for the Revolving Credit Agreement, the Borrowers executed a Security Agreement dated as of March 10, 2015, granting Oxford a security interest in substantially all of the Borrowers' assets, including, without limitation, their then existing and thereafter arising accounts receivable.  Also as security for the Revolving Credit Agreement, 90 West Street executed a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of March 10, 2015, granting Oxford a security interest in the Property.

15.    As of the Petition Date, Oxford claims that a balance of approximately $18 million is owed under the Notes.

### The Selection of the Stalking Horse Bidder

16.    The Debtor and the Stalking Horse are negotiating, subject to the Court's approval, a final the Asset Purchase Agreement ("APA"), which will be filed before the Hearing. A working draft is attached hereto as Exhibit "C", and will be updated.  The APA shall provide as follows (all of which is subject to the terms in the APA):

- Purchase of substantially all of the assets, other than cash, of both 90 West Street and Woodbriar (the "Assets").   The Assets may be sold in conjunction with the assets of Grosvenor.

- Assumption of the Facility Lease and other designed executory contracts as indicated in the APA, at the option of the Stalking Horse.

- The purchase price (the "Purchase Price") for the Assets shall consist of:

    (i)    Payment of $10 million in cash at closing for 90 West, plus a separate payment for the Grosvenor assets on terms to be finalized;

    (ii)   Assumption of all "User Fees" and outstanding real estate and local taxes owed to the Commonwealth of Massachusetts and other local taxing districts accruing through closing;

    (iii)  Reimbursement to the Stalking Horse of all Operating Contributions representing fund advanced by the Brach family to cover operating expense deficiencies pending a sale, anticipated to be approximately $350,000;

    (iv)   Payment of all administrative fees and expenses in this bankruptcy case; and

    (v)    Payment of any other allowed claims against the Debtor.

- Payment by the Stalking Horse of a $1,000,000 earnest money deposit within five (5) business days after the APA is fully executed and an additional $1,000,000 upon entry of an order approving the Bid Procedures.

- In the event a higher and better bid is obtained at the auction, payment to the Stalking Horse of reimbursement of all Operating Contributions.

17.    The APA negotiated by the Debtor with the Stalking Horse will serve as the opening bid for the Assets in an auction that the Debtor proposes be held, subject to Court approval, on _____, 2018 (the "Auction").

## Extraordinary Provisions

18.    Administrative Order No. 557 of the United States Bankruptcy Court for the Eastern District of New York requires that certain Extraordinary Provisions be disclosed and are set forth as follows:

(i)    <u>Sale to Insider</u>:  The Stalking Horse will be owned in whole or in part by the Brach family (the "Brach Group"), likely in combination with Apex, Next Step and perhaps Larry Lipschutz.  The Brach Group has an ownership interest in the Borrowers.  Larry Lipschutz has an ownership interest in the Borrowers, and is also a guarantor of the Borrowers' indebtedness to Oxford.

(ii)    <u>Interim Arrangements with the Stalking Horse</u>:  The Stalking Horse has agreed as part of the APA that it shall advance funds up to the sum of approximately $350,000 to cover any of the Borrowers' operating expense deficiencies (the "Operating Contribution").

(iii)    <u>Transfer Tax Exemption</u>:  The Debtor is seeking to have the Sale declared exempt from taxation under section 1146(a) of the Bankruptcy Code, and will seek confirmation of a plan in conjunction with the Auction process, and a closing to occur after confirmation.

(iv)    <u>Coordination</u>:  It is anticipated that the Auction will be part of a larger transaction involving Woodbriar, and likely the Grosvenor Property and facility, all which will be coordinated in an efficient manner that promotes realization of market value.

## The Proposed Bid Procedures

19.    This section summarizes key provisions of the procedures for the Auction. Capitalized terms used, but not defined in this section, shall have the meanings provided in the Bid Procedures. The descriptions of the Bid Procedures herein are qualified in their entirety by reference to the Bid Procedures attached to the Bid Procedures Order as Exhibit 1.

Participation Requirements. Any person desiring to submit a competing bid for all or part of the Assets (a "Potential Bidder") will be required to deliver the following (the "Participation Requirements") to the Debtor and Oxford on or before _____, 2018: (1) an executed confidentiality agreement in form and substance satisfactory to the Debtor and to Oxford; and (2) written evidence of available funds or a firm commitment for financing sufficient for the Potential Bidder to consummate the Sale satisfactory to the Debtor and to Oxford. The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale pursuant to a Qualified Bid (as defined below).

Interested investors requesting information about the qualification process, and Qualified Bidders (as defined below) requesting information in connection with their due diligence, should contact the Broker retained by the Debtor.

Due Diligence. The Debtor will afford any Potential Bidder who satisfies the Participation Requirements such due diligence access or additional information as the Debtor, in its business judgment, determines to be reasonable and appropriate; provided, however, that the same access and information must also be made available to the Stalking Horse. Additional due diligence will not be provided after the Bid Deadline.

Bid Deadline. The deadline for any bids shall be_____, 2018 at 4:00 p.m. (prevailing Eastern Time). Such bids must be received on or before that date by (1) counsel for the Debtor, Kevin J. Nash, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, NY 10036, (KNash@gwfglaw.com); (2) counsel for Oxford, John Robert Weiss, Duane Morris LLP, 190 South LaSalle Street, Suite 3700, Chicago, IL 60603 (jrweiss@duanemorris.com); and (3) counsel for the Receiver, John T. Morrier, Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210 (morrier@casneredwards.com), (collectively, the "Notice Parties").

Designation of Stalking Horse Bidder. The Debtor and Oxford have selected the Stalking Horse Bid, on the additional terms to be set forth in a signed APA to be presented to the Court, as the current highest and best bid and to serve as the opening bid for the Auction. The bidding at the Auction will start at the Stalking Horse Bid. The next highest bid must exceed the Stalking Horse Bid by at least the Break-Up Fee predicated upon reimbursement of the Operating Contribution, and will continue in increments of at least $100,000 in cash or cash equivalents, except for the Stalking Horse's right to overbid any competing bid by $1,000.

Bid Requirements. To be eligible to participate in the Auction, each bid and each Potential Bidder submitting such a bid must, in the Debtor's discretion, subject to the approval of Oxford:

(1)   offer to consummate the Sale on terms no less favorable to the Debtor than those set forth in a copy of the APA;

(2)   include a marked copy of the APA to show any proposed amendments thereto (the "Modified Agreement") and a clean and executed Modified Agreement;

(3)   include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(4)   state that such offer is binding and irrevocable until the consummation of the Sale;

(5)   offer to pay a purchase price that is greater than all of the components for the Stalking Horse Purchase Price, including the reimbursement of the Operating Contribution;

(6)   disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

(7)   include the names and contact information of members of the bidder who will be available to answer questions regarding the offer, including advisors and related parties;

(8)   include a good-faith deposit in immediately available funds in the amount of $2,000,000;

(9)   provide written evidence of available funds or a firm commitment for financing sufficient to consummate the Sale satisfactory to the Debtor with the approval of Oxford;

(10)  provide for the purchase of all of the Assets; and

(11)  provide information on the operational and financial capabilities of the proposed bidder sufficient to allow the Debtor, Oxford and interested parties to determine such bidder's ability to assume the Facility Lease.

Bids are not required to adopt the business structure as set forth in the APA, and may provide for either a for-profit entity or a not-for-profit

entity as the operator of the Property. The Debtor will not consider bids for less than all of the Assets proposed to be sold under the APA.

Qualified Bidders and Bids. Potential Bidders who have satisfied the Participation Requirements will be deemed "Qualified Bidders." Bids that contain all bid requirements, as determined by the Debtor and Oxford, will be deemed "Qualified Bids." The Debtor and Oxford reserve the right to waive noncompliance with any bid requirement.

The Debtor will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction. The Stalking Horse is deemed a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid in all respects. The Debtor will provide copies of the Qualified Bids to Oxford and to the Receiver.

Auction Participation. Unless otherwise agreed to by the Debtor, only Qualified Bidders, Oxford, and their legal or financial professionals are eligible to attend or participate at the Auction. Subject to the other provisions of the Bid Procedures, if the Debtor does not receive any Qualified Bids other than the Stalking Horse Bid or if no Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Debtor will not hold an Auction and the Stalking Horse will be named the Successful Bidder.

Auction. If any Qualified Bid other than the Stalking Horse Bid for the Assets has been received and any Qualified Bidder other than the Stalking Horse has indicated its intent to participate in the Auction, the Debtor will conduct the Auction at 10:00 am (prevailing Eastern Time) on _____, 2018 at the offices of Duane Morris LLP, 1540 Broadway, New York, NY 10036. At the Auction, only the Stalking Horse and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids. The Debtor, with the approval of Oxford, may conduct the Auction in the manner it reasonably determines, in its business judgment, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of the Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Such rules will provide that:

(1)  the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; and

(2)  all bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each

Qualified Bidder and all of its principals will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction;

(3)   each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction;

(4)   as part of the Break Up Fee, the Stalking Horse shall have the right to outbid any other bid by $1,000.

Closing the Auction. The Auction shall continue until there is only one offer that the Debtor and Oxford determine, subject to Bankruptcy Court approval, is the highest and best offer from among the Qualified Bidders (including the Stalking Horse) submitted at Auction (the "Successful Bid"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the APA (or Modified Agreement, as applicable).

Immediately prior to the conclusion of the Auction, the Debtor and Oxford shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.

The Debtor and Oxford shall also select a back-up bid (the "Back-Up Bid"), which shall remain open and irrevocable until one (1) business day after the closing of the sale with the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Debtor and Oxford may elect to regard the Back-Up Bid as the highest or best bid for the Assets, and the Debtor will be authorized to consummate the transaction contemplated by the Back-Up Bid without further hearing or order of the Bankruptcy Court.

20.   To induce the Stalking Horse to expend the time, energy and resources necessary to maintain operations during the Auction process and to submit the Stalking Horse Bid, the Debtor seeks at this time this Court's approval of the Break-Up Fee, which consists of the reimbursement of the Operating Contribution plus the right of the Stalking Horse to outbid any

other bidder by $1,000. The reimbursement of the Operating Contribution is only payable in the event that the Debtor consummates a sale to a higher and better offer from a party other than the Stalking Horse.

21.    The Debtor proposes to send a notice (the "Auction and Sale Notice" a copy of which is attached to the Bid Procedures Order as Exhibit 2) to all creditors and parties in interest, including all parties having expressed an interest in acquiring all or part of the Debtor's assets.

## Relief Requested

22.    By this Motion, the Debtor respectfully requests:

    (a)    entry of Bid Procedures Order (Ex. A) approving the proposed Bid Procedures (Ex. 1 to Ex. A); and

    (b)    entry of the Sale Order (Ex. B), authorizing the sale of substantially all of the Assets to the Stalking Horse pursuant to the APA to be filed with the Court once finalized, or to another higher and better bidder, pursuant to the terms of Bid Procedures, free and clear of liens, and authorizing assumption of the Facility Lease.

23.    The Debtor and Oxford believe that the Bid Procedures and the proposed sale are fair and reasonable under the circumstances of this chapter 11 case.

## The Basis for the Requested Relief

24.    The Debtor believes that cause exists to grant the relief sought by this Motion. The proposed Bid Procedures are reasonable and necessary to effectuate the sale process and provide sufficient notice and opportunity to permit other bidders to participate in the Auction process. Upon conclusion of the Auction, the Debtor believes that sufficient cause exists to enter an order approving the proposed sale to the Successful Bidder, which likely will be done in conjunction with confirmation of a plan.

### A.    The Proposed Bid Procedures Should Be Approved

25.    The Debtor and Oxford believe it is in the best interests of its estate, creditors, residents and employees to commence a process for soliciting potential bidders to participate in the Auction. The Debtor seeks approval of the Bid Procedures in an effort to test the market and maximize the likelihood of higher and better bids being made for the Assets.    The Debtor believes that the Bid Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtor, to evaluate whether to propose a bid for the Assets that is higher and better than the Stalking Horse Bid for the same Assets.

26.    Under Bankruptcy Rule 6004(f)(1), the Debtor may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Debtor believes that an auction will expose the assets to a broad and diverse market and ensure a sale for the highest and best offer.

27.    The Debtor desires to receive the greatest value for the Assets by testing the public marketplace in the hope that higher and better offers are generated for the Assets.

28.    If the Bid Procedures are approved, and the Motion to Retain Broker is granted, the Debtor will solicit competing Qualified Bids for the Assets. The Bid Procedures describe, among other things, the Assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtor, the receipt, negotiation and qualification of bids received, the conduct of the Auction, and the selection and approval of the Successful Bidder.

### 1.    The Proposed Bid Procedures Are Reasonable and Necessary

29.    The Bid Procedures were developed after much discussion between the Debtor and Oxford, and consideration of many factors.  The Debtor submits that the Bid Procedures are consistent with the Debtor's competing needs to expedite the sale process and promote

participation and active bidding.  Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, fair and open fashion.

30.    The Debtor believes in its best business judgment that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best or highest offer(s) for the Assets. The proposed Bid Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.   The Debtor believes that the Bid Procedures are: (a) sufficient to encourage bidding for the Assets;  (b) consistent with other procedures previously approved by the Court; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bid Procedures are designed to maximize value for the Debtor's estate, while ensuring an orderly sale process.

31.    Once the Debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); Comm. of Asbestos-Related Litigants v. Johns- Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").

32.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Integrated Res., 147 B.R. at 656–57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the

deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

33.    The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

34.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

35.    The Debtor has sound business justifications for seeking approval of the Bid Procedures at this juncture. The Debtor and Oxford believe it is in the best interests of its estate, creditors, residents and employees to commence a bidding procedure immediately, as the Debtor is cognizant of the financial exigencies and the need to proceed with the Chapter 11 case as efficiently and quickly as possible, and has limited funding and resources to try to maximize the value of its assets. In addition, the sale of the Assets provides a realistic means for the

continuation of resident care services for the residents of the Property with minimal interruption and inconvenience. For these reasons, the Debtor has determined, based upon its business judgment, that the best option for maximizing the value of its estate for the benefit of its creditors, residents, employees and other parties in interest is through the sale pursuant to the Bid Procedures.

36.    The Debtor believes that the Bid Procedures will establish the parameters under which the Sale with the Stalking Horse may be tested at the Auction, even though the Stalking Horse is an insider group. The Bid Procedures have been designed with Oxford to encourage competitive bidding in an orderly manner to maximize value for the Debtor's estate. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated and will increase the likelihood that the Debtor will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

37.    As additional support, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly assist the Debtor in maximizing the value that it may obtain for its assets. Consequently, the Debtor respectfully submits that granting the requested relief is "appropriate" under the circumstances.

## 2. The Break-Up Fee is in the Best Interests of the Debtor's Estate

38.    As part of the Stalking Horse, the Brach Group has offered to fund various operating deficiencies to maximize value. To induce the Stalking Horse to expend the time, energy and resources necessary to submit the Stalking Horse Bid, the Debtor and Oxford have agreed to provide, and seeks this Court's approval of, the reimbursement of the Operating

Contribution, plus the Stalking Horse will have the right to outbid any other bid received at the Auction by $1,000, as set forth in the Bid Procedures.

39.     The Debtor proposes to provide the Stalking Horse with the Break-Up Fee as described in the Bid Procedures Order.  Given the operating requirements and the multi-Court coordinating aspects of the sale, the Debtor and Oxford believe that the Break-Up Fee is fair and reasonable in view of (a) the intensive work undertaken by the Stalking Horse in connection with the transaction, (b) the willingness of the Stalking Horse to fund administrative expenses while the sale process is proceeding, and (c) the fact that if the Break-Up Fee is triggered the Debtor will have closed on a higher or otherwise better offer for the Assets, to the benefit of the Debtor's creditors, residents and employees.

40.     Bidding incentives in favor of a stalking horse are measured against a business judgment standard.  In re Integrated Res., Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992).

41.     To receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate. See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 533 (3d Cir. 1999).

42.     Here the benefits provided by the Stalking Horse are self-evident, since the Brach Group is prepared to fund operating shortfalls.  It is only fair that the Break-Up Fee include reimbursement of these monies, which are being advanced without interest.  The back end of the Break-Up Fee relates to the Stalking Horse's topping right of $1,000 over and above any other bid.  Bidding increments are at $100,000, except for the Stalking Horse's right to overbid.

43.     In many cases, a stalking horse gets actual cash consideration plus bid protection, but given the insider status of the Stalking Horse, no additional consideration is being sought other than reimbursement of Operating Contribution, which is critical to the success of the

Debtor's case as it will allow the Property to continue operating while the sales process is proceeding.

44.    The Debtor submits that the Break-Up Fee is a normal, and often necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. See, e.g., In re Kupp Acquisition Corp., Case No. 96-1223 (PJW) (Bankr. D. Del. March 3, 1997); In re Kmart, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders); In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the Debtor's estate, of substantial benefit to the Debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee).

45.    Moreover, the Break-Up Fee will not diminish the assets of the estate available for distribution to creditors, because, as stated above, the Debtor will only be required to reimburse the Operating Contribution if the Debtor consummates a sale with an alternative bidder that exceeds the consideration offered by the Stalking Horse by an amount sufficient to pay the Break-Up Fee.

46.    At this juncture, Oxford is not waiving its credit bid right, although it is the parties' current intention to proceed with a sale to the Stalking Horse or another third party without credit bidding. If this situation changes, the parties will file a supplement.

### B.    The Sale Order Should Be Approved

#### 1.    The Proposed Sale is an Exercise of Sound Business Judgment and Should Be Approved

47.    The Debtor submits that ample authority exists for the approval of the Sale. Section 363 of the Bankruptcy Code, in conjunction with applicable provisions of Section 1123, authorizing a debtor to sell assets of the estate other than in the ordinary course of business under a plan or otherwise.

48.    Although Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if the transaction represents the reasonable business judgment of the debtor.  See Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

49.    If a valid business justification exists for the sale, as it does in this case, the Debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. at 656.  Therefore, parties objecting to the Debtor's proposed Sale must make a showing of "bad faith, self-interest or gross negligence."

Id. at 656; see also In re Johns-Manville Corp., 60 B.R. at 616 ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from decisions made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

50.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See, e.g., In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. at 335–36. The proposed Sale satisfies all these factors.

51.     First, the Debtor has proposed the Sale after thorough consideration of all viable alternatives and extensive negotiations with Oxford, which are ongoing. A sale promotes a better understanding of the current fair market value of real property in today's environment. The maximization of asset value for the benefit of creditors reflects a sound business purpose that warrants authorization of the proposed Sale.

52.     Second, the Debtor's primary creditor, Oxford, was involved in developing the Bid Procedures and Bid Procedures Order. The other creditors of the Debtor are limited, but will receive notice, as well as the Massachusetts taxing authorities and Department of Health, although their principal interest lies in the nursing home and separate Receivership proceedings. The Debtor submits that such notice constitutes adequate and reasonable notice to interested parties.

53.     Third, the value the Debtor will receive for the Assets as a going concern as provided in the APA, or through another purchase agreement(s) between the Debtor and any Successful Bidder, reflects market value, while maintaining appropriate services for residents.

54.    <u>Finally</u>, as described in more detail below, the Sale was negotiated in good faith and at arm's length between the Brach Group and Oxford.

55.    For the foregoing reasons, the Debtor submits that approval of the Sale and all related transactions are appropriate and warranted under section 363 of the Bankruptcy Code.

### 2.    <u>The Proposed Sale Should Be Free and Clear of all Encumbrances</u>

56.    The Debtor further submits that it is appropriate to sell the Assets free and clear of all liens, claims, and non-permitted Encumbrances, pursuant to section 363(f) of the Bankruptcy Code, with any such encumbrances attaching to the net sale proceeds of the Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2)    if such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

57.    Because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Debtor's assets "free and clear" of liens and interests. <u>Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)</u>, 930 F.2d 1132, 1147 n. 24 (6th Cir. 1991) (stating that section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of

the subsections of section 363(f) is met); In re Dundee Equity Corp., 1992 WL 53743, at *4

(Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of

the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

58.    The Court also may authorize the sale of a debtor's assets free and clear of any

liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply.  See

In re Trans World Airlines. Inc., 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001)

(stating that "bankruptcy courts have long had the authority to authorize the sale of estate assets

free and clear even in the absence of § 363(f)"); see also Volvo White Truck Corp. v.

Chambersberg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D.

Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's

equitable powers when necessary to carry out the provisions of Title 11.").

59.    The Debtor believes that one or more of the tests of section 363(f) are satisfied

with respect to the transfer of the Assets pursuant to the sale based upon the consent of Oxford,

which approves of the APA and is not intending to credit bid.  Moreover, any other lienholder

also will be adequately protected by having its liens, if any, attach to the sale proceeds received

by the Debtor for the sale of the Assets to one or more Successful Bidders in the same order of

priority, with the same validity, force and effect that such creditor had prior to such sale, subject

to any claims and defenses the Debtor and its estate may possess with respect thereto.

Additionally, the Stalking Horse is assuming all real estate tax and bed tax liabilities.

Accordingly, section 363(f) authorizes the sale and transfer of the assets free and clear of any

such encumbrances.

**3.    Assumption and Assignment of Assumed Contracts Is
Authorized by Section 365 of the Bankruptcy Code**

60.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor to assume,

subject to the court's approval, executory contracts or unexpired leases of the debtor.  11 U.S.C.

§ 365(a), (b); In re Jamesway Corp., 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996).  Under section

365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn,

codifies the requirements for assuming an unexpired lease or executory contract of a debtor,

providing that:

> (b)(1)  If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume
> such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee--
>
> (A)    cures, or provides adequate assurance that the
> trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance
> that the trustee will promptly compensate, a
> party other than the debtor to such contract or
> lease, for any actual pecuniary loss to such
> party resulting from such default; and
>
> (C)    provides    adequate    assurance    of    future
> performance under such contract or lease.

11 U.S.C. § 365(b)(l).

61.    The standard applied by a court in determining whether the assumption or

rejection of an executory contract or unexpired lease pursuant to section 365(a) should be

approved is the "business judgment" test, which requires a debtor to determine that the requested

assumption or rejection would be beneficial to its estate.  See, e.g., In re Grp. of Inst. Investors,

Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question

[of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc.

(In re Orion Pictures Corp.), 4 F.3d 1095, 1098–99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

62.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y. 1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

63.     In the present case, the only executory contract in play is the Facility Lease, which likely will be designated for assumption in the APA or by any Successful Bidder in their asset purchase agreement (the "Assigned Contracts") (subject to possible modification).   The Facility Lease is effectively a funding mechanism to pay mortgage debt on the Property. Because the Debtor cannot obtain the benefits of the Sale without the assumption of the Facility Lease, including the Facility Lease as part of the sale is undoubtedly a sound exercise of the Debtor's business judgment.

64.     That said, Woodbriar cannot pay the current rents due under the Facility Lease, and is in default.   Accordingly, modifications will be made.   There are no defaults on the Debtor's part which must be cured or made current.

65.     Section 365(f)(l), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co.,

Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910–11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

66.    Other courts have recognized that provisions that have the effect of restricting assignments also cannot be enforced. See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., 77 B.R. 349 (Bankr. D.N.H. 1987), the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. at 354.

67.    Thus, the Debtor requests that any anti-assignment provisions and right of first refusal provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## Notice

68.    Notice of this Motion has been provided by overnight delivery to (a) the Office of the United States Trustee for the Eastern District of New York; (b) all of the Debtor's creditors; (c) Oxford; (d) the Receiver; (e) the Office of the Massachusetts Attorney General;  and (f) all other parties who have requested notice in this case.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, the Debtor respectfully requests that the Court enter the order approving bid procedures and providing certain protections to the Stalking Horse; (ii) authorizing the (a) sale of substantially all of the Assets free and clear of all liens, claims and non-permitted encumbrances to the Stalking Horse or such other higher or better bidder, and (b) the assumption and assignment of the Facility Lease as modified; and (iii) granting such other and further relief as is just and proper.

Dated: New York, New York
        May ⅃, 2018

                    90 WEST STREET LLC

                    By:  /s/ Kevin J. Nash
                        Kevin J. Nash
                        GOLDBERG WEPRIN FINKEL
                        GOLDSTEIN LLP
                        1501 Broadway, 22 Floor
                        New York, NY 10036
                        (212) 221-5700

                        *Counsel for 90 West Street LLC*